## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SUSAN J. HOYE and LEONARDO JIMENEZ, individually and as the representatives of a class of similarly situated persons, and on behalf of The Cambridge Health Alliance Partnership Plan,<br><br>      Plaintiffs,<br><br>V.<br><br>CHA GENERAL SERVICES, INC.; RETIREMENT PLAN COMMITTEE; and JOHN and JANE DOES 1-10,<br><br>      Defendants. | Civil Action No.:<br><br>COMPLAINT<br><br>CLASS ACTION |

## <u>NATURE OF THE ACTION</u>

Plaintiffs Susan J. Hoye and Leonardo Jimenez ("Plaintiffs") bring this class action lawsuit on behalf of their retirement plan, themselves, and other similarly situated individuals. Defendants CHA General Services, Inc. ("Cambridge Health") and John and Jane Does 1-10 (collectively, "Defendants"), are fiduciaries of the retirement plan of which Plaintiffs have been participants, the Cambridge Health Alliance Partnership Plan. As described herein, Defendants have breached their fiduciary duties to the Plan in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), to the detriment of the Plan, its participants, and its beneficiaries. As outlined below, Defendants have failed to ensure that the over 3,600 participants in the Plan have had appropriate investment options and have failed to ensure the fees they pay for plan services are reasonable—during the class period, participants paid as much as $93 for services materially identical to those for which participants in similar plans paid less than half that amount. Plaintiffs bring this action to remedy this unlawful conduct, recover losses to the Plan, and obtain other appropriate relief as provided by ERISA.

## PRELIMINARY STATEMENT

1.      This is a class action complaint against CHA General Services, Inc. and all other Defendants to challenge their repeated failure to administer the Plan prudently or monitor fiduciaries and service providers to the Plan. Plaintiffs sue pursuant to ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132 and allege as follows.

2.      ERISA imposes a range of strict fiduciary duties in order to safeguard plan participants like the Plaintiffs. Fiduciaries—like the Defendants—are subject to strict duties of loyalty and prudence. They must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A) and with the "care, skill, prudence, and diligence" expected in managing a plan of similar scope. *Id.* § 1104(a)(1)(B). These fiduciary duties are among "the highest known to the law." *Sellers v. Trustees of Boston Coll.*, 647 F. Supp. 3d 14, 23 (D. Mass. 2022) (quoting *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 204 (D. Mass. 2020)).

3.      Ensuring that ERISA fiduciaries prudently manage defined contribution ("DC") plans in particular is increasingly important. As of the end of 2022, Americans had approximately $9.3 trillion in such plans—403(b) plans, like the Plan, more common 401(k) plans, and similar vehicles.[1] While defined benefit ("DB") plans, or traditional pensions, were the predominant retirement vehicle for previous generations, less than a quarter of Generation X, Millennials, and Generation Z retirees are expected to receive any traditional pension income.[2] By contrast, two-thirds of workplaces that offer retirement plans offer DC plans.[3]

---

[1] *See* The Brightscope/ICI Defined Contribution Plan Profile: A Close Look at ERISA 403(b) Plans, 2019, at 4 (Apr. 2023), *available at* https://www.ici.org/system/files/2023-04/23-ppr-dcplan-profile-403b.pdf. 403(b) plans, like the Plan, and 401(k) plans operate largely the same in practice and the legal framework applicable to 403(b) plan fiduciaries is materially identical. *See generally*, *e.g.*, *Sweda v. Univ. of Pa.*, 923 F.3d 320 (3d Cir. 2019).

[2] *See* Report on Secure Retirement Institute FactBook: https://401kspecialistmag.com/11-eyebrow-raising-facts-from-the-secure-retirement-institute-chapter-1/). When Congress enacted ERISA, there were more than twice as many DB participants as DC participants. Today, there are almost seven times as many DC participants. Cong. Research Serv., *A Visual Depiction of the Shift from Defined Benefit (DB) to Defined Contribution (DC) Pension Plans in the Private Sector* (Dec. 27, 2021), *available at* https://crsreports.congress.gov/product/pdf/IF/IF12007.

[3] Cong. Research Serv., *supra* n.2 at 1.

4.      At the same time, imprudent and disloyal mismanagement often harms DC plan participants much more than those in DB plans. Employers sponsoring DB plans must stand behind the promised benefit amount and are therefore ultimately responsible for remedying fiduciaries' breaches before participants experience harm: "In a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020). Employers therefore have strong incentives to reduce fees and eliminate underperforming investments. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). In DC plans by contrast, employers do not guarantee any level of benefits, and participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015); *see also Hughes v. Northwestern Univ.,* 142 S. Ct. 737, 740 (2022) ("Each participant chooses how to invest her funds, subject to an important limitation: She may choose only from the menu of options selected by the plan administrators . . ."); 29 U.S.C. § 1002(34). Because employers and other fiduciaries bear no risk, they lack incentive to police costs and investment performance.

5.      The Department of Labor has emphasized that investment options' fees and underperformance can have a pronounced effect on workers' ability to secure their future. For example, a difference of 1% in annual fees can dramatically impact retirement. A worker paying 1.5% instead of 0.5% in fees and earning 7% on an initial $25,000 balance can expect her assets will be nearly *30% lower* after 35 years, adding up to $100,000 less to retire on.[4] That worker can expect a lower quality of life in retirement or may be forced to work extra years to make up for the lost opportunity. Such an outcome is even worse if she also earns less in performance.

---

[4] U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

6.      Market participants who have studied 403(b) plans have concluded that overpayment and waste are rampant in the field, costing participants billions per year. Aon Hewitt Retirement & Investment, in a 2016 report, echoed the DOL's conclusion that small differences in fees can result in tens of thousands less for a worker at retirement.[5] The report urged fiduciaries to take action, noting that "403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness" by, among other things, "[l]everaging aggregate plan size and scale to negotiate competitive pricing."[6]

7.      Despite the high stakes their decisions have on participants' chance for a secure requirement, despite being subject to ERISA's strict fiduciary duties, and despite the serious potential for harm to Plaintiffs and other participants, Defendants utterly failed to employ a prudent process for managing the Plan.

8.      Cambridge Health sponsors a retirement plan for its employees—the Cambridge Health Alliance Partnership Plan.

9.      Defendants' mismanagement of the Plan has cost participants millions of dollars, leading to their paying excess fees and losing out on retirement income. As detailed below, Defendants limited the Plan's participants to low-performing and/or high-cost investment options such as the American Funds EuroPacific Growth Fund, the MFS Value Fund, and the T. Rowe Price All-Cap Opportunities Fund. These three funds alone make up nearly a fifth of Plan participants' assets. Defendants also subjected participants to dramatically high recordkeeping costs over several years in the class period, well higher than similar plans participants pay for recordkeeping services that are materially indistinguishable. Similar issues have been flagged as imprudent in prior ERISA litigation of which Defendants could and should have been aware.

---

[5] Aon Hewitt Retirement & Investment, How 403(b) Plans are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It (Jan. 2016), *available at* https://www.aon.com/attachments/human-capital-consulting/how-403b-plans-are-wasting-nearly-10billion-annually-whitepaper.pdf.

[6] *Id.* at 1.

10.     Courts have frequently concluded that such conduct is sufficient to state a claim for breach of fiduciary duty. *See Velazquez v. Mass. Fin. Servs. Co.*, 320 F. Supp. 3d. 252, 259 (D. Mass. 2018) (plaintiff sufficiently pled claim for fiduciary breach by "plausibly alleg[ing] that the higher fees were unjustified or otherwise improper"); *Baker v. John Hancock Life Ins. Co. (U.S.A.)*, No. 1:20-CV-10397-GAO, 2020 WL 8575183, at *1 (D. Mass. July 23, 2020) ("[T]he long-term retention of a substantial number of underperforming funds at higher than comparable costs gives rise to a plausible inference of an objectively imprudent monitoring process.").

11.     At all times during the Class Period, the Plan had at least $198 million in assets under management. At the end of 2019, 2020, and 2021 it had net assets of approximately $242 million, $280 million, and $318 million, respectively.[7] These assets all were, and continue to be, entrusted to the care of the Plan's fiduciaries, including Defendants.

12.     The Plan's assets under management rank it among the top 3% of all 403(b) plans.[8] Plans this large have outsized bargaining power in the marketplace for DC plan services and greater control over the fees and expenses charged against participants' investments. *See Pinnell v. Teva Pharms. USA, Inc.*, No. CV 19-5738, 2020 WL 1531870, at *5 (E.D. Pa. Mar. 31, 2020). Defendants, however, did not prudently use this power to ensure participants had access to the best investment options and reduce the Plan's expenses.

13.     Based on this and other conduct detailed below, Plaintiffs assert claims against Defendants for breaching their fiduciary duty of prudence (Count One). Plaintiffs also assert a claim against Defendant Cambridge Health for its failure to monitor other fiduciaries appointed

---

[7] For 2022, the Plan reported over $280 million in assets available for benefits and 3,660 participants with account balances at year-end. *See* December 31, 2022 Form 5500, filed with the DOL at 2, 42. The 2022 Form 5500 is the most recent on file.

[8] Brightscope/ICI, *supra* n.1, at 7 (stating that, out of 18,222 403(b) plans on record with the DOL in 2019, only 196 had between $250 million and $500 million in assets, with another 224 having more assets). Similarly, the Plan has had over 3,000 participants for each year of the class period, placing it in the highest percentiles of 403(b) plans by participant counts—only 745 fell in this category, while 246 plans had over 5,000. *See id.* at 10. The ICI is a leading trade association for the mutual fund industry. *See id.* at 80.

to manage the Plan (Count Two). As to the latter claim, Defendants appear to have appointed a "Retirement Plan Committee" with some responsibility for oversight of the Plan.[9]

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), because it is an action brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq.* Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which authorize employee retirement plan participants to bring civil actions on behalf of their Plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

15.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District. This Court also has personal jurisdiction over Defendants because ERISA provides for nationwide service of process.

16.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the ERISA violations occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391, because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## PARTIES

**Plaintiffs**

17.    Plaintiff Susan J. Hoye resides in Arlington, Massachusetts. During and after her employment with Cambridge Health, Plaintiff Hoye participated in the Plan, investing in the

---

[9] The Auditor's Report accompanying the Plan's 2022 Form 5500 is addressed to "the Board of Trustees and Retirement Plan Committee of Cambridge Health Alliance." *See* 2022 Form 5500 at 38. Similar language appeared in the Form 5500 for 2021 but not in reports for earlier years.

options offered under the Plan and experiencing the excessive recordkeeping fees that are the subject of this lawsuit. Plaintiff Hoye has been financially injured by the unlawful conduct described herein. Plaintiff Hoye's account would be worth more today had Defendants not violated ERISA as described herein.

18.    Plaintiff Leonardo Jimenez resides in Dracut, Massachusetts. During his employment with Cambridge Health, Plaintiff Jimenez participated in the Plan,[10] investing in the options offered under the Plan and experiencing the excessive recordkeeping fees that are the subject of this lawsuit. Plaintiff Jimenez has been financially injured by the unlawful conduct described herein. Plaintiff Jimenez's account would be worth more today had Defendants not violated ERISA as described herein.

19.    Plaintiffs have standing to bring this action on behalf of the Plan because they participated in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their account and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

20.    Plaintiffs lacked knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and otherwise engaged in conduct violating ERISA until shortly before they filed suit. These material facts consisted of information such as the investment alternatives that Defendants could have made available within the Plan, the costs and investment performance of existing options compared to potential alternatives that Defendants could have made available, the plan costs they experienced and the costs similarly sized plans paid for recordkeeping services of similar quality, as well as information for costs and performance of different types of available investments.

---

[10] *See generally Firestone Tire & Rubber Co. v. Bruch*, 489 US 101, 117 (1989) (holding that the term "participant" in ERISA includes "former employees [with] 'a colorable claim' to vested benefits").

**Defendants**

21.     Defendant Cambridge Health is a medical institution headquartered in Middlesex County, Massachusetts. Cambridge Health's principal place of business is 230 Highland Avenue, Somerville, MA 02143. *See* Summary Plan Description for The Cambridge Health Alliance Partnership Plan (May 2020) ("SPD") at 4.

22.     Cambridge Health is the "plan sponsor" of the Plan within the meaning of 29 U.S.C. § 1002(16)(B).[11] Cambridge Health is also a "named fiduciary" pursuant to 29 U.S.C. § 1102(a) because it has the ultimate authority to control and manage the operation and administration of the Plan. Moreover, because Cambridge Health exercises discretionary authority or control with respect to management and administration of the Plan and disposition of the Plan's assets, Cambridge Health is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

23.     The Board of Trustees is Cambridge Health's governing body. *See* 2021 Form 990, Part I, Line 3 supplemental information.

24.     Cambridge Health serves as the Plan Administrator for the Plan. 2022 Form 5500 at 2; SPD at 4.

25.     Cambridge Health, as Plan Sponsor and Named Fiduciary, has the power to appoint other fiduciaries of the Plan. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

26.     Cambridge Health, acting through its Board of Trustees and other leadership, had a fiduciary duty to monitor and supervise any appointed Plan fiduciaries, but, as set forth in detail below, all fiduciaries responsible for the Plan's administration have failed to carry out their duties prudently.

27.     For the foregoing reasons, at all times during the Class Period, Cambridge Health was a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority over management or disposition of

---

[11] *See* 2022 Form 5500 at 1, 44 (Auditor's Report, Note A).

Plan assets and exercised discretionary authority to appoint and/or monitor the other fiduciaries, which in turn had control over Plan management and/or authority or control over management or disposition of Plan assets. While Plaintiffs have not named individual Trustees or other Cambridge Health leadership as Defendants, Plaintiffs reserve the right to do so based on information obtained through discovery.

**John Doe Defendants**

28.    To the extent that there are additional officers, employees, board members, administrators, and/or contractors of Cambridge Health who are/were fiduciaries of the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1-10 include, but are not limited to, Cambridge Health officers, employees, board members, administrators, and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## THE PLAN AND ITS ADMINISTRATION

29.    The Plan is a defined contribution or individual account plan that includes a cash or deferred arrangement. It is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), covering eligible current and former Cambridge Health employees, including Plaintiffs. The Plan is a qualified plan under 26 U.S.C. § 403, commonly referred to as a "403(b) plan." SPD at 3.

30.    The Plan was established January 1, 1987. *Id.*

31.    A participant's account consists of the sum of her or his contributions and the employer's matching contributions. *Id.* at 15, 22; 2022 Form 5500 at 44 (Auditor's Report, note A).

32.    Retirement benefits provided by the Plan are based solely on the amounts contributed to a participant account, and any income or gains (or losses) on such contributions,

less any expense that may be allocated to such participant's account. *See* SPD at 15, 22; 2022 Form 5500 at 44 (Auditor's Report, note A).

33.    Transamerica Financial Life Insurance Company and The Lincoln National Life Insurance Company are the Plan Custodians. 2022 Form 5500 at 50 (2022 Auditor's Report, note F). Transamerica is a U.S. subsidiary of Aegon, an international financial services company headquartered in the Netherlands. *See* Transamerica, *Why Transamerica: Media Resources*, https://www.transamerica.com/why-transamerica/news (last visited December 12, 2023).

**Eligibility**

34.    An employee is eligible to participate in the Plan immediately upon hiring and makes contributions through salary deferrals. SPD at 6-7.

35.    An employee must complete two years of service for employer contributions. *Id.*

**Contributions and Vesting**

36.    Once an eligible employee enrolls, Cambridge Health reduces their pay by the amount the employee specifies, subject to IRS limits. *Id.* at 7-9. For eligible participants, contributions are matched by the company at varying rates, based on membership in unions representing Cambridge Health Employees. *Id.* at 9-10; 2022 Form 5500 at 7 (Auditor's Report, note A).

37.    According to the Plan's 2022 Form 5500, employer contributions totaled $7,015,069. Like other employers, Cambridge Health enjoys significant benefits from sponsoring the Plan, including benefiting from increased employee recruitment and reduced turnover.

**The Plan's Investments**

38.    The Plan allows participants to invest in several mutual funds, including target date funds (funds that in turn invest in a mix of equity and fixed income investments ostensibly balanced based on the investor's time until retirement).

39.    Overall, the Plan includes over 25 options, of which 11 are T. Rowe Price target date funds. 2022 Form 5500 at 53. Three of these options are offered through Transamerica,

including the Transamerica Financial Life Insurance Company ("TFLIC") Fixed investment

contract, the largest single investment in the Plan.[12] 2022 Form 5500 at 48, 53.

40.     As alleged below, Defendants failed to prudently manage the Plan's investment

options.

**Payment of Plan Expenses**

41.     During the Class Period, administrative and investment expenses paid using Plan

assets were reported on the Plan's Forms 5500.

**ERISA Fiduciary Duties**

42.     ERISA imposes strict fiduciary duties, including duties of loyalty and prudence,

upon retirement plan fiduciaries like defendants here. ERISA Section 404, 29 U.S.C.

§ 1104(a)(1) provides:  "[A] fiduciary shall discharge [their] duties with respect to a plan solely

in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of (i)

providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses

of administering the plan; (B) with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims; . . . and

(D) in accordance with the documents and instruments governing the plan." *See also Hughes*,

142 S. Ct. at 739.

43.     "[T]he twin duties of loyalty and prudence,' . . . are among 'the highest known to

the law.'" *Glass Dimensions, Inc. v. State Street Bank & Trust Co.*, 931 F. Supp. 2d 296, 304-05

(D. Mass. 2013); *see also Sellers,* 647 F. Supp. 3d at 14; *Sweda*, 923 F.3d at 333.

---

[12] The Plan also allows participants to use a self-directed brokerage option, under which
they may invest their retirement funds in a broader range of options in the marketplace. *See
generally* ERISA Advisory Council on Employee Welfare and Pension Benefit Plans, *Report to
the Honorable Marty Walsh, US Sec'y of Labor, Understanding Brokerage Windows in Self-
Directed Retirement Plans* (Dec. 2021), *available at*
https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/about-us/erisa-advisory-council/2021-
understanding-brokerage-windows-in-self-directed-retirement-plans.pdf. Participants must pay
an annual $50 fee for having a self-directed account. SPD at 15.

44.     ERISA's "prudent person" standard serves "to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). Recently, the Supreme Court emphasized that this standard imposes a "continuing duty of some kind to monitor investments and remove imprudent ones." *Hughes*, 142 S. Ct. at 741 (quoting *Tibble*, 575 U.S. at 530). Fiduciaries must exercise prudence in selecting investments and are also subject to a "continuing duty to monitor [plan] investments and remove imprudent ones," which exists "separate and apart" from the duty with respect to the initial selection. *Tibble*, 575 U.S. at 529. They must dispose of any imprudent investments within a reasonable time and may be held liable either for "assembling an imprudent menu of investment options" or "failing to monitor the plan's investment options to ensure that each option remains prudent." *Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 271 (D. Mass. 2008) (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

45.     A fiduciary must ensure that *each* investment option is and remains prudent, and cannot defend by arguing that it has offered some prudent investments along with imprudent investments. *Hughes*, 142 S. Ct. at 741-42.  "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds" available within the plan could have "theoretically . . . create[d] a prudent portfolio." *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 289 (D. Mass. 2008), *aff'd*, 555 F.3d 1 (1st Cir. 2009) (quoting *DiFelice*, 497 F.3d at 423).

46.     ERISA also requires Plan fiduciaries to act in accordance with Plan documents. Any violation of the terms of plan documents constitutes a fiduciary breach. *Dardaganis v. Grace Capital, Inc.*, 664 F. Supp. 105, 108 (S.D.N.Y. 1987), *aff'd* 889 F.2d 1237 (2d Cir. 1989); *see also Vander Luitgaren v. Sun Life Assur. Co. of Canada*, 765 F. 3d 59, 64 (1st Cir. 2014) ("[A] fiduciary 'must act in accordance with the documents and instruments governing the plan insofar as they accord with the statute.'") (quoting *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 101 (2013)).

## DEFENDANTS' ERISA VIOLATIONS

47.     As described above, Defendants were each fiduciaries of the Plan.

48.     Plaintiffs lacked and continue to lack actual knowledge of Defendants' specific decision-making process for managing the Plan, including their process for selecting and monitoring recordkeeping providers or Plan investments, as this information is in the sole possession of Defendants.

49.     Plaintiffs have drawn reasonable inferences regarding these processes from the facts set forth herein for purposes of this Complaint.

**A.      Defendants Caused Participants to Incur Unreasonable Recordkeeping Fees During the Class Period.**

50.     Transamerica, through Transamerica Retirement Solutions, provides the Plan a set of administrative services, such as tracking participants' account balances and sending participant communications, that collectively are described as "recordkeeping." *See generally Hughes*, 142 S. Ct. at 740; *see also* 2022 Integrated Annual Report of Transamerica parent company Aegon at 346, 349 ("Transamerica Annual Report") (*available at* https://www.aegon.com/sites/default/files/siteassets/2023/iar-2022/aegon-integrated-annual-report-2022.pdf). The services Transamerica provides to Plan participants are materially identical to that of other recordkeepers on the market.[13] As the Transamerica Annual Report notes, "the US marketplace is highly competitive," and numerous recordkeepers in the marketplace (the report lists eight major competitors in the DC market) are able to provide the same services at very little cost. *Id.* at 349-50. Several services (such as processing Qualified Domestic Relations Orders, *see* 29 U.S.C. § 1056 (d)(3)(B)(i)) may even be a profit center for recordkeepers.

---

[13] Plaintiff Hoye submitted an information request to the Plan Administrator pursuant to ERISA Section 104(b)(4) and other authority to obtain information about the Plan and its recordkeeping arrangements. *See* 29 U.S.C. § 1024(b)(4). The documents produced in response, along with other plan disclosures, demonstrate that the services provided are consistent with those provided by other recordkeepers. (That is, the materials do not demonstrate that the Plan's population presents special challenges for recordkeepers or that Transamerica provides services that differ materially from those provided by Transamerica's competitors.)

Recordkeepers will compete to win contracts with DC plans, particularly those with many assets and/or large participant populations, like the Plan.[14]

51.     Plan fiduciaries can arrange for recordkeeping to be paid directly by the plan sponsor or from the plan's assets. For those, like the Plan, paying from plan assets, payments may be made directly or through revenue sharing, under which investments within the plans make payments to the recordkeeper or to the plans directly for recordkeeping costs.

52.     While courts have recognized that fiduciaries' use of revenue sharing is not per se imprudent, they have noted that revenue sharing may hide the true scope of fees from participants and even from fiduciaries themselves. *See, e.g.*, *Tussey v. ABB, Inc.*, 746 F. 3d 327, 336-37 (8th Cir. 2014).

53.     Here, while the Plan engaged in revenue sharing, likely leading to underreporting of the compensation figures on the Plan's Forms 5500, even the reported figures reveal dramatic overpayment to Transamerica.

54.     The Plan paid per-participant fees that exceeded the fees paid for similar services by similar-sized plans throughout the class period. In 2022, the Plan's Form 5500 filed with the DOL reported direct recordkeeping compensation to Transamerica of $231,314. 2022 Form 5500 at 14. The Form reported that Transamerica also received indirect compensation (*i.e.,* revenue sharing).

55.     On a per-participant basis, the direct recordkeeping compensation paid to Transamerica equaled $63.20 for each of the 3,660 Plan participants with account balances in 2022.

---

[14]  In an expert report for a recent case involving recordkeeping services provided by Transamerica competitors, an expert with decades of experience in the recordkeeping industry confirmed that the market is competitive. He also noted that the main drivers determining the fees plans should pay are the participant count for the plan involved, whether the recordkeeper provided more than (standard) core services, and whether the recordkeeper could anticipate earning ancillary revenue (revenue earned as a result of access to participants, such as revenue from participants rolling over to an IRA or purchasing expensive services from the recordkeeper). *See* Expert Report and Rebuttal Report of Ty Minnich, *Sellers v. Trustees of Boston College*, No. 22-cv-10912-WGY (D. Mass.) (D.E. 68-1; 68-6).

56.    The per-participant recordkeeping fees paid were actually higher for most of the class-period as reported on each year's respective Form 5500:

| Year | Per-Participant Fee |
|------|---------------------|
| 2022 | $63.20 |
| 2021 | $77.83 |
| 2020 | $70.13 |
| 2019 | $71.20 |
| 2018 | $71.61 |
| 2017 | $93.03 |

57.    Fee disclosures provided to participants indicate even higher amounts paid for recordkeeping. The 2022 Fee Disclosure, for example, states that the Plan "incurs general administrative fees for ongoing plan administrative services (*e.g.,* recordkeeping) of up to 0.11% annually of assets held in the plan investment options." 2022 Fee Disclosure at F3.[15] The figure was even higher in 2020, at 0.17%, and the disclosure notes that a plan service fee of 0.22% will be deducted from the TFLIC Fixed Fund—the largest plan investment—on a monthly basis. *Id.*; 2020 Fee Disclosure at F3.

58.    Using 0.11% and 0.17% in the fee disclosures yields the following, even higher amounts for recordkeeping costs from 2020 to 2022, without even factoring in the additional fees associated with the TFLIC Fixed Fund:

| Year | Per-Participant Fee |
|------|---------------------|
| 2022 | $95.05 |
| 2021 | $148.60 |
| 2020 | $136.25 |

---

[15] The 2023 Fee Disclosure, provided in response to Plaintiff Hoye's information request, includes the same 0.11% and 0.22% figures. Information regarding the Plan's 2023 assets is not yet available.

59.     Plans with comparable participant counts and/or asset amounts paid dramatically less, providing evidence that Defendants' process for monitoring the Plan's recordkeeping fees was imprudent.

60.     NEPC, a consulting group, recently published the results of a survey of defined contribution plans, reporting on factors such as the fees plans paid. *See* NEPC, LLC, *NEPC 2022 DC Plan Trends & Fee Survey* (March 2023).[16] The group sampled 207 DC plans, with 2.2 million participants and $283 billion in aggregate assets. The median plan had $805 million in assets and 4,506 participants, similar to the Plan's asset and participant counts. *See* NEPC 2022 Report at 4; *see also supra* ¶ 55.

61.     NEPC's survey found that per participant fees decreased as plan sizes increased, that half of surveyed plans with between 5,000 and 15,000 participants paid between approximately $40 and $55 per participant in recordkeeping fees, and that *little or no* such plans in the survey paid above $70. NEPC 2022 Report at 9.

62.     Evidence filed in similar cases before different sessions of the District of Massachusetts yields even lower figures for the reasonable fees available to the Plan.

63.     In *Sellers*, which involves two 401(k) plans with a combined participant population of approximately 6,900, an expert with decades of experience in the recordkeeping industry provided an opinion that a reasonable recordkeeping fee would have been $50 for the years 2016-2018 and $31 for 2018 and beyond. *See* Report, *supra* n.14, at 22. The $31 per-participant figure found support in objective market data, in the form of two separate bids submitted in response to a Request for Proposal ("RFP") in 2018 to provide recordkeeping services for a combined plan. Each of the two $31 bids was from an established recordkeeper.

64.     In *Brown v. The MITRE Corporation*, the Court denied a motion to dismiss claims regarding recordkeeping fees, noting that the plaintiffs there alleged that "[b]etween 2013 to 2019, at least eleven plans, ranging in size from 3,146 to 15,246 participants, paid between $23

---

[16] *Available at* https://www.nepc.com/wp-content/uploads/2023/03/2022-NEPC-DC-Plan-Trends-Fees-Survey-Results_Final.pdf.

to $35 per participant in recordkeeping fees to varying recordkeepers." No. 22-CV-10976-DJC, 2023 WL 2383772, at *2 (D. Mass. Mar. 6, 2023) (citing Complaint); *see also* Complaint, *Brown v. The MITRE Corp.*, ¶ 87 (listing plans with fewer than 7,000 participants, that paid $32.74 or less in per-participant fees).[17]

65.    To satisfy their duty of prudence, fiduciaries must evaluate all fees participants pay to a recordkeeper or other service provider on a continuing basis. *See* Dep't of Labor, *A Look at 401(k) Plan Fees*, *supra* n.4, at 2; *see also Bugielski v. AT&T Servs., Inc.*, 76 F.4th 894, 912 (9th Cir. 2023) ("[T]he duty of prudence requires a fiduciary to discharge his or her duties "solely in the interest of [plan] participants and beneficiaries" and for the purpose of "defraying reasonable expenses of administering" the plan. A fiduciary cannot do so, however, if he or she is unaware of how and to what extent a service provider is compensated.") (citation omitted). This requires an evaluation of every fee a service provider receives, whether through direct compensation or revenue sharing, and a prudent fiduciary should ensure any payments exceeding reasonable compensation are returned to the Plan. Here, the Form 5500 reports that, in addition to the high direct revenue paid to Transamerica, the recordkeeper received indirect revenue as well, without providing details. *See supra* ¶ 14.

66.    Apart from indirect revenue from items such as revenue sharing, recordkeepers also earn ancillary revenue as a result of their relationships with plans. Report, *supra* n.14, at 15-16. This can come in the form of revenue from participants rolling over funds to Individual Retirement Accounts, *see id.*, or participants purchasing services such as investment advice or investment management from companies such as Transamerica. In fact, Teachers Insurance Annuity Association ("TIAA") a major recordkeeper, settled with the New York Attorney

---

[17] The Plan's Forms 5500, indicate that the Transamerica contract included a Revenue Credit arrangement, through which Transamerica returns some funds to the Plan. However, the Transamerica contract was not included in the response to Plaintiff Hoye's information request, *see supra* n.13, and it is unclear how the revenue credit amount relates to the Form 5500 and fee disclosure data. Discovery is needed to establish the actual amount Transamerica received, in direct and indirect compensation.

General's office and the SEC in an investigation arising out of aggressive marketing practices attempting to secure ancillary revenue in the form of "lucrative management fees." *See In re Investigation by Letitia James of TIAA-CREF Individual & Institutional Services, LLC,* Assurance of Discontinuance at 1, 21-035 (July 13, 2021).

67.    The information available to Plaintiffs contains no indication that Defendants made themselves aware of the possibility of ancillary revenue. To the contrary, the excessive direct compensation to Transamerica indicates that Defendants did not require Transamerica to reduce its fees or otherwise monitor Transamerica to account for any such revenue.

68.    Prudent fiduciaries not only ensure they are aware of the compensation service providers receive but also look externally, to the marketplace, to determine what comparable plans are paying their service providers. This information, consequently, helps determine what is reasonable compensation. Courts have held that this may require conducting a Request for Proposal process, issuing RFPs every three to five years as a matter of course or more often if benchmarking or other information shows the fees are unreasonable. *See Sellers,* 647 F. Supp. 3d at 26 (collecting cases); *Brown*, 2023 WL 2383772, at *6; *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015). Industry participants, too, emphasize the importance of an RFP process. *See* NEPC, LLC, *NEPC 2020 Defined Contribution Progress Report* at 12.[18] ("While there is scale pricing, (i.e., larger plans can access lower fees), operational complexity and service levels drive meaningful differentiation in price. Best practice is to compare fees and services through a record-keeping vendor search [RFP] process."). Obtaining market information is particularly important since fees in the retirement plan marketplace regularly show a downward trend. *See* Brightscope/ICI, *supra* n.1 at 39; Report, *supra* n.8 at 6-8.

69.    Both ERISA and DOL regulations "require[] plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of

---

[18] *Available at* https://nepc.com/institutional/nepcs-2020-defined-contribution-plan-fee-survey/ (last visited December 12, 2023).

the plan's participants and beneficiaries." DOL 408(b)(2) Regulation Fact Sheet[19] at 1. In guidance to fiduciaries, the DOL has emphasized that staying informed about the marketplace is a key component of prudent conduct:

"Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers."

*Id.* (emphasis added).

70.    The facts available to Plaintiffs—including that the Plan has retained the same recordkeeper over the course of the Class Period and before and that the fees paid are excessive—support an inference that Defendants failed to conduct RFPs at reasonable periods and otherwise failed adequately to explore whether the Plan could obtain more favorable rates in the recordkeeping marketplace, which is highly competitive and includes many firms capable of offering the same levels of service, as even Transamerica itself recognizes, *see supra* ¶ 50.

71.    In light of the Plan's asset size and participant count, the trend toward lower recordkeeping expenses and the competitive nature of the marketplace, and evidence that comparable plans paid much less for the same services, the Plan could have obtained recordkeeping services of the same or better quality at a lower cost.

**B.    Defendants Failed To Act Meaningfully to Monitor Investments, Limiting Participants to Imprudent Investment Options.**

72.    Defendants also failed to prudently select and monitor the Plan's investment options during the Class Period. These failures wasted the Plan's assets and harmed each

---

[19] *Available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/factsheets/final-regulation-service-provider-disclosures-under-408b2.pdf.

participant's ability to obtain a secure retirement through the impact of high fees and/or low performance.

73.    In comparison to options in similarly sized plans, the Plan's investments were more expensive and returned less than comparable options found in similarly sized plans.

74.    Each fund in the Plan has an associated "expense ratio," reflecting the fee investing participants are charged for investment management and other services. "The size of the expense ratio varies based on a host of factors unique to each investment, such as the size of the fund, the frequency of trading, and the complexity of its holdings." *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 482 (8th Cir. 2020) (citing DOL guidance). The expense ratio is based on a percentage of assets. An expense ratio of 0.5% means a participant will pay $5.00 annually for every $1000 in assets invested in that fund. The expense will then reduce the participant's return and the compounding effect of that return, as outlined in the DOL's "A Look at 401(k) Fees" guidance. *Supra* n.4. This effect increases the importance of having prudent fiduciaries monitoring investment fees and net performance.

75.    As noted above, Defendants are responsible for monitoring the various investment options made available to Plan participants. The Plan's Form 5500 lists the options. As of December 31, 2022, the options with the most significant participant assets invested, excluding target date funds, were:

| Option Name | Total Assets |
|---|---|
| TFLIC Fixed General Account | $55,765,880 |
| T. Rowe Price All-Cap Opportunities Fund | $26,793,271 |
| Vanguard Institutional Index Fund | $22,252,896 |
| Vanguard Extended Market Index Fund | $21,633,929 |
| MFS Value Fund | $15,733,324 |
| American Funds EuroPacific Growth Fund | $8,232,981 |
| Metropolitan West Total Return Bond Fund | $7,700,946 |

76.     The Plan has included investment options with unreasonably high expense ratios. For example, the T. Rowe Price All-Cap Opportunities Fund has been included throughout the class period (though it was previously the New America Growth Fund) and holds the second-highest level of participant assets. The Plan has disclosed that participants invested in the T. Rowe Price All-Cap Opportunities Fund pay a 0.81% expense ratio for the privilege of investing in it. Comparable funds charge a lower expense ratio—the Vanguard Growth Index Fund Admiral Shares charges less than a tenth of the expense ratio (0.05%) and the J.P. Morgan Large Cap Growth Fund R6 class charges 0.44%. Both of the latter funds performed better than the T. Rowe Price fund in the past year, and the J.P. Morgan Fund additionally outperformed over the 5- and 10-year period.

77.     Taking account both fees and performance, either the Vanguard or the J.P. Morgan options would yield a higher amount available for retirement, according to fee and performance data available from FINRA.[20] After ten years, the T. Rowe Price Fund's dramatically higher cost would essentially erase any performance advantage and, in the case of the J.P. Morgan alternative, heighten the performance disadvantage:

| Fund | 10-Year Cost for $10,000 investment | 1-Year Return | 3-Year Return | 5-Year Return | 10-Year Return |
|---|---|---|---|---|---|
| T. Rowe Price All-Cap Opportunities Fund | $999.63 | 17.52% | 7.36% | 16.26% | 14.64% |
| J.P. Morgan Large Cap Growth Fund | $553.87 | 21.26% | 6.44% | 18.04% | 15.55% |
| Vanguard Mid-Cap Value Index Fund | $64.28 | 28.83% | 7.67% | 16.06% | 13.87% |

78.     As FINRA also reports, all of these funds are in the same Morningstar category and have the same Morningstar rating.

---

[20] FINRA, or the Financial Industry Regulatory Authority, is a government-authorized self regulatory organization that oversees U.S. broker-dealers. *See* https://www.finra.org/about.

79.     Plaintiffs cite these potential alternatives as examples of funds available in the marketplace. As with the market for recordkeeping, the universe of mutual funds available is large and there are multiple options to choose from for each investment category (e.g., mid-cap value, large-cap growth, etc.).

80.     Similarly, for the MFS Value fund, the Plan's investment option holding the fifth highest level of participants' assets, Charles Schwab and Vanguard offered options in the same Morningstar category, with the same Morningstar rating, with dramatically lower expense ratios and higher performance: the Vanguard Value Index Fund Admiral Shares (with a 0.05% expense ratio) and the Schwab Fundamental US Large Company Index Fund (with a 0.25% expense ratio).

81.     Using FINRA's data, the fee and performance comparison for these potential alternatives show that plan participants paid much more for their investment with performance that did not justify the expense:

| Fund | 10-Year Cost for $10,000 investment | 1-Year Return | 3-Year Return | 5-Year Return | 10-Year Return |
|------|------|------|------|------|------|
| MFS Value Fund | $987.82 | -0.30% | 7.57% | 7.88% | 8.19% |
| Schwab Fundamental US Large Company | $317.93 | 6.42% | 12.65% | 11.76% | 10.53% |
| Vanguard Value Index Fund | $64.28 | 0.53% | 10.11% | 8.50% | 9.41% |

82.     As with the T. Rowe Price fund, these potential alternatives are only examples of the options available on the market.

83.     Finally, the American Funds EuroPacific Growth Fund likewise demonstrates excessive costs and underperformance relative to alternatives, in that case from DFA International and Vanguard. Again, FINRA's data shows options with the same Morningstar rating, lower expense, and higher performance: the DFA International Large Cap Growth

Portfolio (with a 0.05% expense ratio) and the Schwab Fundamental US Large Company Index Fund (with a 0.25% expense ratio).

84.    FINRA's fee and performance data again shows these options led to plan participants paying more for worse performance:

| Fund | 10-Year Cost for $10,000 investment | 1-Year Return | 3-Year Return | 5-Year Return | 10-Year Return |
|---|---|---|---|---|---|
| American Funds EuroPacific Growth | $1,011.43 | 6.38% | -2.46% | 5.50% | 4.22% |
| DFA International Large Cap Growth | $380.49 | 8.44% | 2.46% | 7.11% | 4.74% |
| Vanguard International Growth | $430.30 | 4.17% | -7.11% | 8.04% | 6.84% |

85.    As with the other comparisons, these potential alternatives are only examples of the options available on the market. The fact that there were several superior options available for the most significant options in the Plan is evidence that Defendants did not employ a prudent process in administering the Plan.

86.    In fact, Defendants do not appear to have substituted *any* of the most significant options in the Plan during the class period. The Plan's investment options, from 2017 to the present, show that two options were added but no existing options were removed or substituted.

87.    As with recordkeeping expenses, plan fiduciaries should evaluate investment fees by obtaining detailed pricing information and regularly comparing existing investment options in the relevant Plan to potential alternatives. Again, larger plans generally qualify for lower fees. The effect is pronounced compared to recordkeeping fees, because mutual funds offer lower-fee share classes to investors that satisfy a threshold amount invested. In addition, the same investments may be available through lower-cost vehicles such as Separate Accounts.

88.    Had Defendants prudently monitored the investments within the Plan, Defendants would have taken action as to the T. Rowe Price All Opportunities Fund, the MFS Value Fund, the American Funds EuroPacific Growth Fund and other funds in favor of superior funds

featuring comparable investment objectives, superior performance, and lower fees. Such actions could have taken the form of removing, freezing, replacing, or renegotiating the terms of these options.

## CLASS ACTION ALLEGATIONS

89.    Plaintiffs bring causes of action as a class action on behalf of themselves and all others similarly situated. ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2) allows participants to bring actions on behalf of a plan. Plaintiffs seek certification pursuant to that provision and pursuant to Federal Rule of Civil Procedure 23(a) and (b). The putative Class that Plaintiffs seek to represent is defined as follows:

> All persons, except Defendants and their immediate family members, who were participants in, or beneficiaries of the Plan, at any time between December 29, 2017 through the date of judgment (the "Class Period").[21]

90.    Numerosity: The members of the Putative Class are so numerous that joinder of all members is impractical. As of December 31, 2022, the Plan had 3,660 "participants with account balances as of the end of the plan year" 2022 Form 5500 at 2. To require individual actions would prejudice putative Class Members and Defendants. The identities of the putative Class Members, and the details of their retirement plan accounts, will be determined from Defendants' records.

91.    Typicality: Plaintiffs' claims are typical of those of other members of the Putative Class. Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement, like other Class members. Defendants treated Plaintiffs and other Class members consistently and managed the Plan uniformly as to all Participants. Plaintiffs' claims arise out of the same conduct and misconduct by Defendants, as alleged herein, that form the basis of Class members' claims. Defendants' wrongful conduct has affected all members of the

---

[21] Plaintiffs reserve the right to propose different or additional classes or subclasses in their motion for class certification or subsequent pleadings.

Class similarly. Plaintiffs' claims are thereby representative of and co-extensive with the claims of the Class.

92.    <u>Commonality</u>: There are questions of law and fact common to Plaintiffs and putative Class Members that predominate over any questions affecting only individual members of the putative Class. These common questions of law and fact include, but are not limited to:

a)  Whether Defendants are and/or were fiduciaries of the Plan;

b)  Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

c)  Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

d)  The proper form of equitable and injunctive relief; and

e)  The proper measure of monetary relief.

93.    <u>Adequacy of Representation</u>: Plaintiffs have no conflicts of interest with other Class Members, will fairly and adequately represent the Class, and will prosecute the case vigorously on behalf of the Class. Counsel representing Plaintiffs are competent and experienced in litigating complex cases and large class actions, including ERISA and other employment law cases.

94.    <u>Superiority of Class Action</u>:  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Putative Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests. An award of equitable relief, such as removal of fiduciaries, would apply to all participants in the Plan and would thus be dispositive of their interests.

95.     In the alternative, certification is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

96.     Finally, certification is warranted under Rule 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' misconduct applied uniformly to all Class members, who individually do not have an interest in pursuing separate actions. The amount of each individual's recovery is relatively small compared to the burden of individual prosecution. Certification will also obviate the need for duplicative litigation that might render inconsistent judgment, and management of this action as a class action will not present likely difficulties.

97.     If each individual Member of the Putative Class were required to file an individual lawsuit, Defendants would necessarily gain an unfair advantage because Defendant would be able to exploit and overwhelm the limited resources of each Class Member with Defendants' vastly superior financial legal resources.

98.     Requiring each individual Member of the Putative Class to pursue an individual remedy would also discourage the assertion of lawful claims by those Class Members, particularly by those still employed by Cambridge Health, who would be disinclined to pursue these claims against Defendant because of an appreciable and justifiable fear of retaliation and permanent damage to their careers and well-being.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty of Prudence in Violation of ERISA (29 U.S.C. § 1104(a)(1)(B))

99.     Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

100.    As alleged above, Defendants are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

101.    ERISA Section 404, 29 U.S.C. § 1104, imposes fiduciary duties of prudence upon the Defendants in connection with the administration of the Plan, the selection and monitoring of Plan investments, and the monitoring of service providers to the Plan.

102.    Defendants' fiduciary responsibilities include managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with appropriate care, skill, diligence, and prudence. Defendants are also required to act in accordance with the documents and instruments governing the Plan insofar as they are consistent with ERISA. Finally, Defendants are obligated to ensure that the Plan's fees are reasonable, to select and retain prudent investment options, evaluate and monitor the Plan's investments on an ongoing basis and eliminate imprudent ones, and take all necessary steps to ensure that the Plan's assets are invested prudently. This duty includes "a continuing duty . . . to monitor investments and remove imprudent ones[.]" *Hughes*, 142 S. Ct. at 741; *Tibble*, 575 U.S. at 529.

103.    As detailed above, Defendants failed to prudently and objectively monitor the Plan's investments to ensure that each of the investments was and remained appropriate for the Plan. Defendants failed to remove those investments that were no longer appropriate. Defendants retained imprudent funds as Plan investments despite the availability of superior alternative investments that would have cost Plan participants significantly less and performed significantly better. Defendants failed to remove underperforming and costly funds, and to investigate alternatives to Transamerica as recordkeeper.

104.    Each of the actions and omissions described in Paragraph 103 above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

105.    Defendants' conduct likely also constitutes a breach of their duty to act in accordance with the documents and instruments governing the plan, in violation of ERISA Section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

106.    The Plan and its participants suffered millions of dollars in losses as a consequence of Defendants' fiduciary breaches.

107.    Under ERISA Sections 409 and 502, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to make good to the Plan all losses resulting from the aforementioned fiduciary breaches, to restore to the Plan any profits Defendants made through use of Plan assets, and to restore to the Plan any profits resulting from their breaches of fiduciary duties.

108.    Each Defendant knowingly participated in each breach of the other Defendants, with knowledge that such acts were a breach, and enabled other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties. Each Defendant knew of the other Defendants' breaches and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Under ERISA Section 405, 29 U.S.C. § 1105(a), each Defendant is therefore also liable for the losses caused by the breaches of their co-fiduciaries.

109.    Wherefore, Plaintiffs and Members of the putative Class request relief as hereinafter provided.

## SECOND CAUSE OF ACTION

### Failure to Monitor Fiduciaries

110.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

111.    Defendant Cambridge Health is a fiduciary of the Plan with responsibilities relating to the selection and monitoring of Plan investment options.

112.    Cambridge Health is responsible for appointing and removing administrators and individuals charged with administration and oversight of the Plan. Cambridge Health therefore has a fiduciary responsibility to monitor the performance of all other fiduciaries.

113.    ERISA requires monitoring fiduciaries to ensure that the fiduciaries they monitor in turn satisfy their fiduciary obligations. These obligations include those with respect to investment selections, monitoring of service providers, and compliance with plan documents. Monitoring fiduciaries are required to act promptly to protect plans, participants, and beneficiaries when monitored fiduciaries breach their own obligations.

114.    Cambridge Health breached its fiduciary monitoring duties in numerous ways, including:

    a)  failing to monitor and evaluate the performance of individuals appointed to monitor and administer the Plan and failing to have a system in place for doing so. Cambridge Health did nothing as the Plan suffered significant losses as a result of imprudent actions and omissions;

    b)  failing to monitor the processes by which those responsible selected and monitored Plan investments. The monitored fiduciaries actions and inactions would have alerted a prudent fiduciary to the breaches of fiduciary duties outlined above; and

    c)  failing to remove administrators whose performance was inadequate as demonstrated by their retaining imprudent, excessively costly, and poorly performing investments within the Plan and failing properly to monitor recordkeeping fees to the detriment of the Plan and Plan participants' retirement savings.

115.    Due to these foregoing breaches of the duty to monitor, the Plan suffered millions of dollars per year in losses due to excessive fees and investment underperformance.

116.    ERISA Sections 409 and 502, 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), render Cambridge Health liable to restore to the Plan all losses suffered as a result of the fiduciary breaches that resulted from its failure to properly monitor its appointed fiduciaries.

117.    Wherefore, Plaintiffs and putative Class Members request relief as hereinafter provided.

## **PRAYER**

118.    For these reasons, Plaintiffs and Class Members respectfully request that judgment be entered in their favor awarding the following relief:

a)    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

b)    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

c)    A Declaration that the Defendants have breached their fiduciary duties under ERISA;

d)    An Order compelling the Defendants to personally make good to the Plan all losses to the Plan incurred as a result of Defendants' breaches of their fiduciary duties described above and to restore the Plan and its participants to the position they would have been in but for this unlawful conduct;

e)    An order requiring Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against Defendants as necessary to effectuate said relief, and to prevent Defendants' unjust enrichment;

f)    Restoration of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

g)    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

h)    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan, transfer of Plan assets out

of imprudent investments into prudent alternatives, and removal of fiduciaries deemed to have breached their fiduciary duties;

i) An award of pre-judgment interest;

j) An award of attorneys' fees and costs pursuant to ERISA Section 502(g), 29 U.S.C. § 1132(g) and the common fund doctrine; and

k) An award of such other and further relief as the Court deems equitable and just.

Dated: December 29, 2023                    Respectfully submitted,


                                            /s/*Osvaldo Vazquez*
                                            Stephen Churchill, BBO #564158
                                            Osvaldo Vazquez, BBO #711808
                                            FAIR WORK, P.C.
                                            192 South Street, Suite 450
                                            Boston, MA 02111
                                            Tel. (617) 607-3260
                                            Fax.(617) 488-2261
                                            steve@fairworklaw.com
                                            oz@fairworklaw.com

                                            *Attorneys for Plaintiffs and Class Members*