UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SUSAN J. HOYE AND LEONARDO JIMENEZ, INDIVIDUALLY AND AS THE REPRESENTATIVES OF A CLASS OF SIMILARLY SITUATED PERSONS, AND ON BEHALF OF THE CAMBRIDGE HEALTH ALLIANCE PARTNERSHIP PLAN, <br><br> Plaintiffs, <br><br> v. <br><br> CHA GENERAL SERVICES, INC.; RETIREMENT PLAN COMMITTEE; AND JOHN AND JANE DOES 1-10, <br><br> Defendants. | Civil Action No. 23-13238-MJJ |

## MEMORANDUM OF DECISION

February 5, 2025

JOUN, D.J.

Susan J. Hoye ("Ms. Hoye") and Leonardo Jimenez ("Mr. Jimenez") have filed suit individually and on behalf of similarly situated persons and beneficiaries of The Cambridge Health Alliance Partnership Plan (the "Plan") (collectively, "Plaintiffs"), against the Plan's fiduciaries, CHA General Services, Inc. ("Cambridge Health"), Retirement Plan Committee, and John and Jane Does 1-10 (collectively, "Defendants"), alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA"). [Doc. No. 12 at 1; *Id*. at ¶ 47]. Plaintiffs are bringing this suit pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132. [*Id*. at ¶ 1]. The putative class that Plaintiffs seek to represent includes those who were participants in or beneficiaries of the Plan at any time between December 29, 2017, through the date of judgment

(the "Class Period"), excluding any Defendants and their immediate family members. [*Id*. at ¶ 92].

Plaintiffs claim all Defendants breached their fiduciary duty of prudence; specifically, as the fiduciaries of the Plan, Defendants failed to ensure that participants have had appropriate investment options and that the Plan's service fees were reasonable. [*Id*. at 1; *id.* at ¶ 13]. Plaintiffs additionally allege that Cambridge Health failed to monitor other fiduciaries appointed to manage the Plan, as a "Retirement Plan Committee" was appointed in 2021 with some responsibility for oversight of the Plan. [*Id*. at ¶ 13].

On May 24, 2024, Defendants filed a Motion to Dismiss for failure to state a claim. [Doc. No. 28]. The matter was fully briefed. [Doc. Nos. 30, 32]. For the following reasons, Defendants' motion is DENIED.

## I.  BACKGROUND

The below facts come from the Amended Complaint and are taken as true for purposes of evaluating Defendants' Motion to Dismiss. *See Ruivo v. Wells Fargo Bank*, 766 F.3d 87, 90 (1st Cir. 2014). In addition to the Amended Complaint, I also consider those documents "sufficiently referred to" or incorporated by it. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

### A.  The Plan

Ms. Hoye and Mr. Jimenez were or are employees of Cambridge Health who participated in the Plan—a 403(b) defined contribution retirement plan—during the Class Period. [Doc. No. 12 at ¶¶ 3, 17-18]. Upon hiring, an employee is immediately eligible to participate in the Plan and would make contributions through salary deferrals. [*Id*. at ¶ 34]. The Plan had net assets of around $242 million, $280 million, and $318 million at the end of 2019, 2020, and 2021, respectively. [*Id*. at ¶ 11]. The Plan had over 3,000 participants for each year of the Class Period.

[*Id.* at ¶ 12 n.8]. In 2022, the Plan had 3,660 participants and over $280 million in assets available for benefits. [*Id.*]. Of these, at least $198 million were under management—making it among the top 3% of largest managed 403(b) plans.[1] [*Id.* at ¶¶ 11-12]. A participant's account is the sum of individual contributions plus the employer's matching contributions, which start after two years of service. [*Id.* at ¶¶ 31, 35].

Cambridge Health is the Plan Sponsor. [*Id.* at ¶ 22]. Cambridge Health is also the Plan Administrator, a named fiduciary under 29 U.S.C. § 1102(a) with the ultimate authority to control and manage the operation and administration of the Plan, and a functional fiduciary under 29 U.S.C. § 1002(21)(A) because it exercises discretionary authority or control regarding management and administration of the Plan and disposition of the Plan's assets. [*Id.* at ¶¶ 22, 24]. As Plan Sponsor and Named Fiduciary, Cambridge Health has the power to appoint other fiduciaries of the Plan; it also has the corresponding fiduciary duty to monitor and supervise any appointees. [*Id.* at ¶¶ 25-26].

B. **Recordkeeping Fees**

Transamerica Financial Life Insurance Company ("Transamerica"), through Transamerica Retirement Solutions, provides the Plan's recordkeeping services and has done so for the entirety of the Class Period. [*Id.* at ¶¶ 50, 73]. These administrative services include tracking participants' account balances and sending participant communications. [*Id.*]. Numerous recordkeepers in the marketplace are able to provide the same services at very little cost. [*Id.*] The services provided by Transamerica are consistent with those provided by other recordkeepers. [*Id.*].

---

[1] Large direct contribution plans with substantial management generally have a larger bargaining power in the market for services, fees, and expenses than other plans. [Doc. No. 12 at ¶ 12].

The Plan's fiduciaries may choose whether recordkeeping is paid for by the Plan sponsor or from the Plan's assets. [*Id*. at ¶ 52]. Here, recordkeeping was paid for from the Plan's assets via revenue sharing. [*Id*. at ¶ 54]. Revenue sharing, under which investments within the plans make payments to the recordkeeper or to the plans directly for recordkeeping costs, may result in hiding the true scope of fees from participants and fiduciaries. [*Id.* at ¶¶ 52-53].

During the Class Period, the Plan paid per-participant fees that exceeded the fees paid for similar services by similar-sized plans. [*Id*. at ¶ 55]. The publicly reported direct recordkeeping fees per participant were as follows ("Table 1"):

| Year | Per-Participant Fee |
|---|---|
| 2022 | $63.20 |
| 2021 | $77.83 |
| 2020 | $70.13 |
| 2019 | $71.20 |
| 2018 | $71.61 |
| 2017 | $93.03 |

[*Id*. at ¶ 57]. In addition to the direct recordkeeping fees above, Transamerica also received indirect revenue. [*Id*. at ¶ 55]. Fee disclosures provided to participants indicate even higher amounts paid for recordkeeping, noting that the Plan incurred general administrative fees for recordkeeping of up to 0.11% in 2022 and 0.17% in 2020, with a plan service fee of 0.22% deducted from the largest plan investment on a monthly basis. [*Id*. at ¶ 58]. Using these percentages, the fees were as follows:

| Year | Per-Participant Fee |
|---|---|
| 2022 | $95.05 |
| 2021 | $148.60 |
| 2020 | $136.25 |

4

[*Id*. at ¶ 59].

NEPC, a consulting group, recently surveyed defined contribution plans and confirmed that larger plans are able to obtain lower recordkeeping fees. [*Id.* at ¶¶ 61-62]. NEPC sampled 207 plans, with the median plan having $805 million in assets and 4,506 participants. [*Id.* at ¶ 61]. For plans with participants counts between 1,000 and 5,000, half paid between approximately $45 and approximately $70 per participant. [*Id.* at ¶ 62]. It is highly likely that the smaller plans accounted for the bulk of the higher-fee survey responses in this category and that larger plans within the range paid less. [*Id.*]. Plaintiffs also compared the Plan to similar ERISA plans discussed in *Sellers v. Trustees of Coll.*, 647 F. Supp. 3d 14 (D. Mass. 2022) and *Brown v. The MITRE Corp.*, No. 22-cv-10976, 2023 WL 238772 (D. Mass. Mar. 6, 2023). [*Id.* at ¶¶ 64-65].

Recordkeepers may also earn ancillary revenue as a result of their relationships with plans. [*Id.* at ¶ 68]. This can come in the form of revenue from participants rolling over funds to Individual Retirement Accounts, or participants purchasing services such as investment advice or investment management from companies such as Transamerica. [*Id.*]. There is no indication that Defendants made themselves aware of the possibility of ancillary revenue, and Defendants may not have required Transamerica to reduce its fees or otherwise monitored Transamerica to account for any such revenue. [*Id.* at ¶ 70].

### C. Investment Options

Defendants are responsible for monitoring the investment options made available to Plan participants. [*Id.* at ¶ 78]. The investments offered under this Plan includes more than 25 options. [*Id*. at ¶¶ 38-39]. Of those, eleven are T. Rowe Price target date funds and three are from Transamerica. [*Id*. at ¶ 39]. Participants also had a self-directed brokerage option. [*Id*. at n.12]. If

they partook in this option, they would be charged an additional $50 annually. [*Id.*]. As of December 31, 2022, the options with the most significant participant assets, excluding any target date funds, were: TFLIC Fixed General Account, T. Rowe Price All-Cap Opportunities Fund, Vanguard Institutional Index Fund, Vanguard Extended Market Index Fund, MFS Value Fund, American Funds EuroPacific Growth Fund, and Metropolitan West Total Return Bond Fund. [*Id.* at ¶ 78].

Each fund in the Plan has an "expense ratio," which is reflective of the proportion of fees that investing participants are charged. [*Id.* at ¶ 77]. The T. Rowe Price All-Cap Opportunities Fund, the second largest investment in the Plan, had an expense ratio of 0.81%. [*Id.* at ¶ 79]. The Vanguard Growth Index Fund Admiral Shares and J.P. Morgan Large Cap Growth Fund R6, comparable funds in the market, had expense ratios of 0.05% and 0.44%, respectively.[2] [*Id.* at ¶ 79]. None of the most significant options were removed or substituted during the class period, although two new options were added. [*Id.* at ¶ 89]. Based on the funds' expense ratios and a $10,000 investment, a return-on-investment ("ROI") comparison of these funds is as follows:

| Fund | 10-Year Cost for $10,000 investment | 1-Year Return | 3-Year Return | 5-Year Return | 10-Year Return |
|---|---|---|---|---|---|
| T. Rowe Price All-Cap Opportunities Fund | $999.63 | 17.52% | 7.36% | 16.26% | 14.64% |
| J.P. Morgan Large Cap Growth Fund | $553.87 | 21.26% | 6.44% | 18.04% | 15.55% |
| Vanguard Mid-Cap Value Index Fund | $64.28 | 28.83% | 7.67% | 16.06% | 13.87% |

[*Id.* at ¶ 80].

Another example includes the MFS Value fund, the Plan's fifth largest participant investment, with potential alternatives, Schwab Fundamental US Large Company Index Fund

---

[2] All of these funds are in the same Morningstar category and have the same rating. [Doc. No. 12 at ¶ 81].

and Vanguard Value Index Fund Admiral Shares.[3] [*Id*. at ¶ 83]. Based on the funds' expense ratios and a $10,000 investment, a ROI comparison of these funds is as follows:

| Fund | 10-Year Cost for $10,000 investment | 1-Year Return | 3-Year Return | 5-Year Return | 10-Year Return |
|---|---|---|---|---|---|
| MFS Value Fund | $987.82 | -0.30% | 7.57% | 7.88% | 8.19% |
| Schwab Fundamental US Large Company | $317.93 | 6.42% | 12.65% | 11.76% | 10.53% |
| Vanguard Value Index Fund | $64.28 | 0.53% | 10.11% | 8.50% | 9.41% |

[*Id*. at ¶ 84].

A final comparison is between the Plan's sixth most participated fund, American Funds EuroPacific Growth Fund, with DFA International Large Cap Growth and Vanguard International Growth, other analogous alternatives.[4] [*Id*. at ¶ 86]. Based on the funds' expense ratios and a $10,000 investment, a ROI comparison of these funds is as follows:

| Fund | 10-Year Cost for $10,000 investment | 1-Year Return | 3-Year Return | 5-Year Return | 10-Year Return |
|---|---|---|---|---|---|
| American Funds EuroPacific Growth | $1,011.43 | 6.38% | -2.46% | 5.50% | 4.22% |
| DFA International Large Cap Growth | $380.49 | 8.44% | 2.46% | 7.11% | 4.74% |
| Vanguard International Growth | $430.30 | 4.17% | -7.11% | 8.04% | 6.84% |

[*Id*. at ¶ 87].

## II.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). "A claim

---

[3] All of these funds are in the same Morningstar category and have the same rating. [Doc. No. 12 at ¶ 83].

[4] All of these funds are in the same Morningstar rating. [Doc. No. 12 at ¶ 86].

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonably inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (cleaned up). The court must "assume the truth of all well-pleaded facts and indulge all reasonable inferences that fit the plaintiff's stated theory of liability." *Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev.*, 421 F.3d 1, 5 (1st Cir. 2005) (cleaned up). Furthermore, "in ERISA cases, it is recognized that plaintiffs often do not have access to certain information needed to make well-pleaded factual allegations, but such allegations are sufficient so long as they make reasonable inferences . . . based on the information available to them." *Sellers*, 647 F. Supp. 3d at 27 (D. Mass. 2022) (cleaned up).

### III.   ANALYSIS[5]

#### A. <u>Standing</u>

Defendants argue Ms. Hoye and Mr. Jimenez lack standing in their claim regarding fund investments because they did not invest in the T. Rowe Price All-Cap Opportunities Fund, MFS Value Fund, or American Funds EuroPacific Growth (collectively, the "Challenged Funds"). [Doc. No. 29 at 15]; *see* [Doc. No. 10-7; Doc. No. 10-8]. Because of this, Defendants believe there can be no individualized injury established and, thus, no Article III standing.

To establish standing under Article III, "a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the

---

[5] Defendants request judicial notice of: (1) the Plan's Form 5500s, (2) the Form 5500s for the Boston College Plans underlying the expert report submitted in *Sellers v. Trustees of Boston College*, No. 22-cv-10912 (D. Mass.) (D.E. 68-1; 68-6) (the "*Sellers* report"); (3) the Form 5500s for the MITRE Corp. Plans underlying the decision issued in *Brown*, 2023 WL 2383772 (the "*Brown* order"); and (4) the *Sellers* report. Plaintiffs agree that these materials are subject to judicial notice. [Doc. No. 30 at 11 n.5]. I take judicial notice of these documents, as publicly available documents that are central to and referenced in the Amended Complaints and whose authenticity cannot reasonably be disputed.

8

injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U. S. Bank N.A.*, 590 U.S. 538, 540 (2020) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "But in order to establish standing, a plaintiff does not need to show that her rights have actually been abridged: such a requirement 'would conflate the issue of standing with the merits of the suit.'" *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 52 (1st Cir. 2014) (quoting *Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006)). "A named plaintiff in a putative class action has class standing if he alleges personal injury caused by the defendant and that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *In re Biogen, Inc. ERISA Litig.*, No. 20-cv-11325, 2021 WL 3116331, at *3 (D. Mass. July 22, 2021) (cleaned up). In line with this, "[i]t is well-established that for the purpose of constitutional standing, a plaintiff need not have invested in each fund at issue but must merely plead an injury implicating defendants' fund management practices." *Velazquez v. Mass. Fin. Servs. Co.*, 320 F. Supp. 3d 252, 257 (D. Mass. 2018) (cleaned up).

     Defendants seek to limit this standing principle to cases where the plaintiffs are invested in at least some of the funds they seek to challenge, even if not all. [Doc. No. 32 at 2]. While cases relied upon by Plaintiffs largely involve such investments, the fact that Plaintiffs did not invest in the Challenged Funds does not affect the analysis. In *Khan*, the Court found standing based on the principle that "the injury in fact stems from the 'alleged foregone opportunities from funds that were not included and the alleged reduction in choice that resulted.'" *Khan v. PTC, Inc.*, No. 20-cv-11710, 2021 WL 1550929, at *3 (D. Mass. Apr. 20, 2021) (quoting *Sacerdote v. N.Y. Univ.*, No. 16-cv-6284, 2018 WL 840364, at *7 (S.D.N.Y. Feb. 13, 2018)). In *In re Biogen*, the Court concluded plaintiffs asserted an injury because they each alleged that

9

"they personally paid excessive fees in connection with their own investments" and therefore had joint stakes in litigating whether defendants had breached their fiduciary duties in managing the Plan's investments. *In re Biogen*, 2021 WL 3116331, at *4. Thus, the crux of the standing analysis is not whether the plaintiff invested in certain challenged funds, but whether the *plan*—in which the plaintiff has invested—suffered an injury implicating the defendant's conduct in managing all the funds as a group. *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. SACV151614JLSJCGX, 2016 WL 4507117, at *4 (C.D. Cal. Aug. 5, 2016) ("[C]ourts look to the nature of the claims and allegations to determine whether the pleaded injury relates to the defendants' management of the Plan *as a whole*.").

      Here, Plaintiffs plead, "Had Defendants prudently monitored the investments within the Plan, Defendants would have taken action as to the T. Rowe Price All Opportunities Fund, the MFS Value Fund, the American Funds EuroPacific Growth Fund and other funds in favor of superior funds featuring comparable investment objectives, superior performance, and lower fees." [Doc. No. 12 at ¶ 91]. Notably, the funds challenged by Plaintiffs are not limited to the three listed exemplars. Plaintiffs further allege that, "[h]ad Defendants not breached their duty, Plaintiffs would each have paid lower recordkeeping fees and the value of each of their accounts would correspondingly be higher," and that "[t]he Plan and its participants suffered millions of dollars in losses as a consequence of Defendants' fiduciary breaches." [*Id.* at ¶¶ 19, 109]. The effects of the fiduciary mismanagement alleged by Plaintiffs are present across the Plan and not localized to the Challenged Funds only. Accordingly, Plaintiffs have established the requisite constitutional standing to challenge the Plan's investments. *See, e.g.*, *Khan v. PTC, Inc.*, No. 20-cv-11710, 2021 WL 1550929, at *3 (D. Mass. Apr. 20, 2021) (allegations including that fiduciaries "failed to investigate and select lower-cost alternative funds" and "to monitor and

control the Plan's recordkeeping expenses" were "sufficient to plead that the Plan suffered an injury in fact and, under the majority approach … to permit [plaintiffs] to pursue their claims on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2)").[6]

### B. Recordkeeping Fee Claim

ERISA was designed by Congress to "promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). Specifically, ERISA imposes duties of loyalty and prudence on plan fiduciaries, 29 U.S.C. § 1104(a)(1)(A)-(B), and fiduciaries are liable for breach of such duties, 29 U.S.C. § 1109(a). "[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and – for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Furthermore, a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id*. at § 1004(a)(1)(B). The test of prudence "is one of conduct, and not a test of the result of performance of the investment." *Barchock v. CVS Health Corp.*, 886 F.3d 43, 44 (1st Cir. 2018) (cleaned up). "A claim for breach of a fiduciary duty under ERISA includes proving a breach, a loss, and the causal connection between the two." *Parmenter v. Prudential Ins. Co. of Am.*, 93 F.4th 13, 19 (1st Cir. 2024) (cleaned up). In addition, "there can be no breach of a particular duty if a party does not owe that duty to the plaintiff in the first place." *Id.* "Fiduciaries

---

[6] Defendants argue that Plaintiffs cannot rely on their allegations regarding the Plan's recordkeeping fees to provide standing to challenge the Plan's investments. It is true that "plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek[.]" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (quoting *Davis v. Fed. Election Com'n*, 554 U.S. 724, 734 (2008)). Here, Plaintiff's allegations regarding the Plan's recordkeeping costs also provide a factual basis for standing as to their challenge to Defendants' management of the Plan's investments.

have a general duty to monitor recordkeeping expenses and, more generally, they have a prudential duty to be cost-conscious in the administration of a plan." *Turner v. Schneider Elec. Holdings, Inc.*, 530 F. Supp. 3d 127, 136 (D. Mass. 2021). Breach of the duty of prudence occurs when a fiduciary fails to diligently monitor and investigate administrative expenses, such as recordkeeping fees. *Id.* "[T]he question whether it was imprudent to pay a particular amount of record-keeping fees generally involves questions of fact that cannot be resolved on a motion to dismiss." *Short v. Brown Univ.*, 320 F. Supp. 3d 363, 371 (D.R.I. 2018) (cleaned up).

Here, Plaintiffs allege the per-participant recordkeeping fees paid to Transamerica were higher for most of the Class Period under the Plan than under plans with comparable participant counts and/or asset amounts, evidencing that Defendants' process for monitoring the Plan's recordkeeping fees was imprudent. *See, e.g.*, [Doc. No. 12 at ¶¶ 60, 74]. Plaintiffs also allege that Defendants engage in revenue sharing, which may hide the true scope of fees and likely lead to underreporting of the compensation figures on the Plan's Forms 5500. [*Id.* at ¶¶ 52-54]. Finally, Plaintiffs allege that Defendants failed to conduct Requests for Proposal ("RFPs") at reasonable periods and otherwise failed adequately to explore whether the Plan could obtain more favorable rates in the recordkeeping marketplace, instead retaining the same recordkeeper over the course of the Class Period and before and paying excessive fees. [*Id.* at ¶ 73].

Defendants seek dismissal of Plaintiffs' claim relative to the Plan's recordkeeping fees on the grounds that (1) Plaintiffs cannot show comparable plans received similar recordkeeping services at lower costs; (2) Plaintiffs do not identify the specific services Transamerica provided here or compare those services to those provided by purported comparators; and (3) Plaintiffs improperly compare direct and indirect compensation. These arguments miss the mark.

First, Defendants argue Plaintiffs' claims lack plausibility because the NEPC survey, the *Sellers* report, and the *Brown* order do not have a similar amount of assets and participants to the Plan and therefore do not provide meaningful benchmarks. [Doc. No. 29 at 17-18]. The Plan had over 3,000 participants for each year of the Class Period, [Doc. No. 12 at ¶ 12 n.8], with 3,660 participants in 2022, [*id.* at ¶ 11]. During the Class Period, the per-participant fees ranged from $63.20 to $93.03. [*Id.* at ¶ 57]. The NEPC survey sampled 207 plans and reported that the median plan had 4,506 participants. [*Id.* at ¶ 61]. It included plans with participants counts between 1,000 and 5,000, showing that half paid between approximately $45 and approximately $70 per participant; meanwhile, little or no plans with between 5,000 and 15,000 participants paid above $70 in fees. [*Id.* at ¶ 62]. Overall, the NEPC survey "confirmed the principle that larger plans are able to obtain lower recordkeeping fees and showed lower fees across a range of plan sizes," with per-participant fees decreasing as plan sizes increased. [*Id.*]. Accordingly, the NEPC survey supports a plausible inference of imprudence where it provides meaningful benchmarks and generally demonstrates a correlation between plan size and fee amount, as relevant here.

The *Sellers* report and the *Brown* order likewise provide meaningful benchmarks and demonstrate the correlation between plan size and fee amount. *See* [*id.* at ¶ 66 (noting that, while certain plans discussed in *Sellers* and *Brown* were larger than the Plan, the data collectively "enforces the conclusion that recordkeeping fees are related to size and that fees have declined over time given the competitive nature of the marketplace")]. Plaintiffs assert that *Sellers* involves "two 401(k) plans with a *combined* participant population of approximately 6,900," with one of those plans ("*Sellers* Plan II") involving 3,300 participants, [Doc. No. 12 at ¶ 64 (emphasis added)]—contrary to Defendants' assertion that those plans were twice as large as the Plan—and

13

also involves the discussion of multiple other comparator plans, which had per-participant fees ranging from $29.51 to $54. [*Id.*]. Plaintiffs' note that *Sellers* Plan II paid between $47 and $92 per participant from 2017 on does not undermine Plaintiffs' position, despite $92 being on the higher end of per-participant recordkeeping fees, where Plaintiffs also state that those fees were above $70 for only the first two years of the relevant period and declined thereafter following an RFP. *See* [*id.* at ¶ 64]. And the Amended Complaint specifies that *Brown* considered a range of plans, varying in size from 3,146 to 15,246 participants, and paying between $23 to $35 per participant in recordkeeping fees. [*Id.* at ¶ 65 (noting *Brown* complaint further listed "plans with fewer than 7,000 participants, that paid $32.74 or less in per-participant fees")].

Next, Defendants argue that Plaintiffs present conclusory allegations regarding the similarity in services received from Transamerica as compared to any purported comparator. Plaintiffs allege that Transamerica "provides the Plan a set of administrative services, such as tracking participants' account balances and sending participant communications," and that these services provided by Transamerica are "materially identical to that of other recordkeepers on the market." [Doc. No. 12 at ¶ 50]. I have no basis at this stage to doubt the plausibility of these allegations. *See Brown*, 2023 WL 2383772, at *4; *Rodriguez et al. v. Hy-Vee, Inc. et al.*, No. 22-cv-00072, 2022 WL 16648825, at *12 (S.D. Iowa Oct. 21, 2022). "Although there are rulings from other Circuits to consider" with seemingly more stringent standards for alleging a recordkeeping claim—citing *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022), upon which Defendants heavily rely—"the First Circuit has not foreclosed plaintiffs' complaint." *Brown*, 2023 WL 2383772, at *5 (cleaned up).

Defendants also argue that the Plan received materially different services from the plans at issue in *Sellers* and *Brown*, where the Plan's 2022 Form 5500 enumerates thirteen services that

Transamerica performed for the Plan; in comparison, the *Sellers* plans reported two categories of services by their recordkeepers, and the *Brown* plans reported four or fewer categories of services. [Doc. No. 29 at 23-24]. While the plans self-report varying *numbers* of categories, they do not establish that Transamerica's thirteen services differ in substance from the potentially broader service categories reported by the plans in *Sellers* and *Brown*. Ultimately, whether the services materially differed is a question of fact and cannot be resolved at this stage.

Finally, Defendants argue that Plaintiffs improperly compare the Plan's combined indirect and direct costs to others' direct cost only, "to inflate the Plan's alleged per-participant recordkeeping fee to $95.05." [Doc. No. 29 at 25]. But Plaintiffs assert that the Amended Complaint bases the comparisons on the Form 5500 only, [Doc. No. 30 at 23], and the Plan's direct costs as listed in Table 1 were well out of the range of comparable plans in any event—with the per-participant fee reaching $93.03 in 2017, [Doc. No. 12 at ¶ 57].

Reading the Amended Complaint as whole, in the light most favorable to Plaintiffs, and drawing all reasonable inferences in favor of Plaintiffs, Plaintiffs plausibly allege that Defendants breached their duty of prudence relative to the Plan's recordkeeping fees.

### C. Failure to Monitor

Where Plaintiffs' failure to monitor claim is derivative of the underlying breach of fiduciary duty claim, and where said underlying claim has been plausibly alleged, the failure to monitor claim also survives. *See Somers v. Cape Cod Healthcare, Inc.*, No. 23-cv-12946, 2024 WL 4008527, at *6 (D. Mass. Aug. 30, 2024) ("[P]laintiffs' claims for failure to monitor [will] continue insofar as they derive from plaintiffs' other claims" (quoting *Tracey v. Mass. Inst. of Tech.*, No. 16-cv-11620, 2017 WL 4478239, at *3 (D. Mass. Oct. 4, 2017)).

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is <u>DENIED.</u>

SO ORDERED.

<u>/s/ Myong J. Joun</u><br>
United States District Judge